In the Matter of the Judicial Settlement of the Account of
HENRY B. BOLTON et al., as Executors, etc.

HENRY B. BOLTON et al., Respondents; SARAH L. MYERS et
al., Appellants.

The jurisdiction of this court on appeal from a judgment of General Term
affirming a surrogate's decree on settlement of the accounts of executors
is limited to questions of law presented by proper exceptions.

(Argued December 15, 1893; decided January 16, 1894.)

APPEAL from judgment of the General Term of the Supreme
Court in the second judicial department, entered upon an
order made May 8, 1893, which affirmed a decree of the Sur-
rogate's Court of Westchester county settling the accounts of
Henry B. Bolton and Thomas Bolton, Jr., as executors of the
will of Ann Bolton, deceased.

The following is the opinion in full:

"Upon the accounting of the executors of Ann Bolton,
deceased, Mrs. Myers and Mrs. Littlewood, her daughters,
appeared as contestants and filed objections to the accounts
rendered. The decree of the surrogate was adverse to them
as to various items, and we are now to determine whether
any of their overruled objections were well taken.

"Our jurisdiction is more limited than that of the surrogate
and of the Supreme Court, as we can consider only questions
of law presented for our consideration by proper exceptions.
While after careful examination we find no error of law in
this record, we are not without some misgivings that injustice
may have been done to the contestants in the settlement of
the accounts, but we see no remedy for it here.

"Mrs. Bolton died in November, 1882, leaving two sons, the
executors, two daughters and an adopted son, William H.
Birchall. From a period anterior to 1880 down to the time of
her death she owned certain real estate occupied by a manu-
facturing establishment upon which for many years the busi-
ness of bleaching, dying and printing had been carried on.
On the first day of March, 1880, she leased to her two sons
and adopted son this real estate with all the machinery thereon
for the term of ten years for an annual rental, and they carried

on the business there under the name of the Bronx Company. Shortly before the expiration of the lease the real estate was taken by the city of New York by condemnation proceedings for the Bronx park, and an award was made therefor to the owners thereof, which was paid and distributed. The lessees continued to occupy the real estate and the machinery until a short time before August 31st, 1891, when they were ordered by the city to surrender the possession of the real estate and remove the machinery. They then advertised, and on that day sold by auction the machinery belonging to the estate of the deceased for $592.82. Most of the machinery was purchased by Mr. Birchall and thereafter taken to West Farms, a distance of two or three miles, and there put into other buildings and used in the same business by the Bronx Company. It was claimed before the surrogate, and is now claimed by the contestants, that the machinery at the time of the sale was worth over $52,000; that the sale thereof was improvident; that the machinery was really purchased by the Bronx Company and for it by and through Birchall; that the Bronx Company had had the benefit of the purchase, and that, therefore, the executors, who were two of the three members of the Bronx Company, should be charged with the value thereof.

" We are inclined to think that as matter of justice the executors should be charged with a larger sum for the machinery than it brought at the auction sale. But there was really no reliable basis in the evidence before the surrogate for doing it. The sale is not attacked for fraud. It was extensively advertised in newspapers and by printed notices and catalogues. Notices of the sale were mailed to the contestants and their counsel, and there is no evidence that they did not receive them. There can be no doubt that the executors meant to give, and did in fact give ample notice of the sale. At the sale there were present from fifty to seventy-five persons, among them several dealers in second-hand machinery. The sale was fairly conducted by a competent and experienced auctioneer, and there is no charge that any artifice was used by any one to stifle competition among bidders, or that the machinery was not sold in parcels and in such manner as to bring the best price. There was competition among bidders,

there being more than one bid for each article sold. Mr. Birchall at the auction sale purchased most of the machinery, and some was bid off by others. Of the articles so bid off he subsequently purchased some at an advanced price, and some of it was retained by such bidders. While the evidence is not entirely clear upon the subject, it is quite convincing that Birchall paid for the machinery with the money of the Bronx Company, and that the machinery was removed to West Farms and most of it there placed in buildings at the expense of that company, and for its benefit, and that it has since been used by that company in its business. Now, what could the executors have done better? They, for their own protection, were bound to sell by auction, and they made the best sale they could. They were not requested to postpone the sale, and no protest was made against it. So far as appears they had no reason to suppose that the contestants objected to the sale at that time and in that way, or that better prices could be obtained by postponing the sale to some future time. As to the value of the machinery evidence was given that at the time the real estate was appraised in the condemnation proceedings, two witnesses were called by the executors as claimaints there who testified that the machinery was worth about $52,000, and one of the same witnesses was called by the contestants before the surrogate and testified that at that time the machinery was, in his opinion, worth that sum. But his estimate was that it was worth that sum in position in the buildings, and in use there in a large, established and prosperous business. But he did not estimate its value to be sold there and removed, and used or re-sold elsewhere. It is common experience that machinery sold in a mill, to be removed therefrom, will usually bring but a small sum, far less than its intrinsic value. That is so because generally it is difficult to find purchasers for such machinery, and hence the absence of real competition keeps down prices. The experienced auctioneer who made the sale testified that it was heavy machinery, that it was located at a place from which it was difficult of transportation; that he judged from the location of it and the character of a great deal of it, which was very old, that it brought about all it was worth; that

there was nothing sold on one bid ; that he saw a number of dealers in second-hand machinery there. There was the further difficulty in charging the executors with any particular value for this machinery, that it did not appear precisely what machinery was put to use in their manufacturing establishment at West Farms, nor what was the approximate value of that machinery at the time of the sale for removal from the place where it was. Taking all these facts, with the testimony of the auctioneer as to value, and the evidence of the value furnished by the sale made as it was, we cannot say that the surrogate erred as matter of law in refusing to charge the executors for the machinery a larger sum than they obtained therefor at the auction sale. We think it would be impossible now for any one to take all the evidence in this record and fix a value which ought to be paid upon the machinery taken and in use by the Bronx Company over and above that obtained therefor at the auction sale.

" Thomas Bolton, senior, for the purpose of protecting his real estate against his creditors, executed a mortgage thereon without any consideration to Mr. Birehall, and he immediately assigned that mortgage without any consideration to Mrs. Bolton, the deceased. The mortgagor died in January, 1879, leaving a will by which he gave all his property to his wife, Ann Bolton, and he appointed his son Henry B. Bolton his executor. After his death Ann Bolton, for the purpose of cutting off the creditors of her husband, foreclosed that mortgage, and upon such foreclosure and the sale in pursuance thereof she obtained against Henry B. Bolton, as executor of his father, a deficiency judgment of upwards of $29,000. Her executors made no attempt to collect that judgment, and, hence, the claim is made that they should be charged with the amount thereof. Assuming that the judgment was enforcible against the estate of the mortgagor, it is a sufficient answer to this claim that there was no proof that the judgment was collectible, or worth anything, inasmuch as the mortgagor died insolvent. There was, therefore, no basis for making any charge on account thereof against the executors.

" The Bronx Company were the brokers and financial agents of Mrs. Bolton, and the executors claimed credit upon their

accounting for divers sums of money paid for her in her life-time, and the contestants objected to the allowance of many of these items. The answer to these objections is that there was evidence quite satisfactory that all these payments were made at the request of Mrs. Bolton.

" What we have thus far said covers the principal points made by the appellants upon this appeal, and a careful examination of the whole case brings us to the conclusion that there were no legal errors committed by the surrogate to the prejudice of ' the appellants, and that the judgment must be affirmed, with costs."

*James R. Marvin* for appellants.

*Alexander Thain* for respondents.

EARL, J., reads for affirmance.
All concur, except BARTLETT, J., not sitting.
Judgment affirmed.